Filed 8/28/20  In re K.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074787 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ109895) |
| v. | OPINION |
| G.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant, G.M.

Jacques A. Love, under appointment by the Court of Appeal, for Defendant and Appellant, V.M.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand, and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants G.M. (father) and V.M. (mother) are married, live together, and have four children together: K.M.M., born 2007; K.L.M., born 2010; H.M., born 2013; and S.M., born 2016. The parents here challenge the juvenile court's orders terminating their parental rights over the three youngest children and selecting adoption as their permanent plans—their parental rights over K.M.M. are not at issue in this appeal. Both parents contend that the juvenile court should have instead applied the beneficial parental relationship exception (Welf. & Inst. Code,[1] § 366.36, subd. (c)(1)(B)(i)). Father contends in the alternative that the juvenile court should have applied the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)). We affirm the judgment.

## I. BACKGROUND

The four children came to the attention of plaintiff and respondent Riverside County Department of Public Social Services (DPSS) in March 2016, when it received a referral alleging severe neglect. The social worker identified "issues of concern" including a need for stable housing, and developmental assessments for the children. DPSS offered the family voluntary family maintenance services.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

In the ensuing months, however, it became apparent that voluntary family maintenance services were insufficient. DPSS took the children into protective custody in September 2016. The dependency petitions alleged that the children came within section 300, subdivision (b) (failure to protect), based on mother's unresolved mental health issues; mother's previous child welfare history; father's failure to intervene and protect the children from mother's mental health issues; father's child welfare history; the parents' engaging in domestic disputes in the presence of the children; and the parents' lack of stable housing and provisions for the children.

One of the final straws before DPSS took the children into protective custody, described in the detention report, was mother's behavior at a "Team Decision Making" meeting on August 31, 2016. According to the detention report, the meeting resulted in a "Safety Plan" for the children to go to the home of a maternal aunt, to keep the children from being homeless and to facilitate the older children's enrollment in school. After the meeting, mother became "agitated," accusing DPSS of taking the children from her. At one point, as father and the social worker were trying to calm her down, mother stated "'You want the baby, here take her'" and "abruptly tossed the car seat towards [the social worker] with [S.M.] inside." Mother was then "witnessed biting her hand to the point she was bleeding," and "hitting her head[,] pulling her fingers and screaming." Law enforcement was summoned, and mother was escorted from the building.

On September 8, 2016, the juvenile court ordered all four children detained from the parents. Initially, K.M.M. and K.L.M. were placed together in one foster home, and

3

H.M. and S.M. together in another. Later in the month, however, H.M. and S.M. were moved to separate foster homes. The juvenile court ordered twice-weekly supervised visitation.

The jurisdiction/disposition report, submitted in October 2016, detailed the extensive child welfare history of both parents, dating back to 2001. Among other things, DPSS reported that in October 2007 and January 2008, Mother's parental rights to two half-siblings of the children at issue here had been terminated. Two psychological examinations of mother, conducted in 2005, reported that she "exhibit[ed] limited intellectual ability coupled with personality traits that would prevent [her] from having the capacity to child rear and meet the demands of [her] children," including a history of "explosive disorder," and a lack of "the ability to have empathy" or "address the needs of others." In a previous dependency proceeding, father had been "directed not to leave [mother] alone with the children," but he had "failed to protect [the children] from her impulsive behavior."

Mother and father both visited with the children. The social worker reported that the visits had "been a slight struggle when it [was] time to end," because K.M.M. and K.L.M. both would become very upset. Also, during one visit, mother "was observed shaking [H.M.] in an angry manner," reportedly in an "'attempt to get her to stop crying.'" Father attempted to "re-direct" mother, stating "'Stop that! That's what got us here in the first place.'" Later in the same visit, mother grabbed K.M.M. by the arm, and again was redirected by father.

4

An addendum report, filed by DPSS in November 2016, informed the court that on November 10, , K.M.M. and K.L.M. had been moved to separate foster homes. The addendum also included an updated psychological evaluation for mother. The psychologist opined that mother "suffers from a borderline personality disorder," characterized by "impulsive behavior, her low self-image, the instability of her interpersonal relationships, as well as her affective instability." Mother exhibited "difficulty controlling her anger," and "episodes of transient, stress-related, paranoid thinking." The psychologist also observed that mother suffers from "borderline intellectual functioning."

At the contested jurisdictional hearing on November 29, 2016, the trial court ruled that the children came within section 300, subdivision (b), finding true allegations based on mother's unresolved mental health issues, father's failure to intervene to protect the children from mother's unresolved mental health issues, and the parents engaging in domestic disputes in the presence of the children. The court removed the children from the parents' custody and ordered family reunification services for both parents.

In April 2017, K.L.M.'s foster mother requested de facto parent status. The request stated that K.L.M. was "thriving" in the foster home. She had "responded well to structure," was "very loving and helpful around the house," "loves school and was recently student of the month."

In a May 2017 status review report, DPSS reported the children each had special developmental, emotional, and academic needs. The parents regularly attended

visitation, and "[f]or most visits" they were "appropriate and able to parent their children adequately." Often, however, during the visits the parents required "additional assistance from the caregivers for doing things such as dealing with tantrums, consoling a child, or taking them to the restroom." Also, visitation supervisors observed that "at times, the parents come to visits upset at one another and have argued in front of the children and caregivers." Additionally, although "visitation quality" had been "strong," the caregivers "regularly reported after visits that the children 'regress.'" The older children were "defiant, angry, and/or disruptive at home" following visitations, and were "observed to wet the bed and have more bathroom accidents after visiting or speaking with their parents on the phone." At the six-month review hearing in May 2017, the juvenile court ordered continued family reunification services, and granted the de facto parent request by K.L.M.'s foster mother.

In the November 2017 12-month status review report, DPSS noted that visitation remained supervised "due to domestic violence incidents that have occurred during the first two unsupervised visits granted to the parents." Several of the children had reported that father had hit mother. During supervised visits, the parents continued to "bicker at one another, and on a few occasions, the parents have raised their voices." Father was also observed "undermining [mother's] parenting": "For example, [mother] tells the kids no more chocolate donuts, and the child will start crying. [Father] will tell the child, that she can have donuts later. The child vomited the donuts later." The parents acted appropriately when they visited with the children separately.

In June 2017, H.M. had been placed with K.L.M. in the same foster home. The two children were both doing well, and were observed to have a very strong bond to one another. The caregiver reported, however, that the children's behavior changes around mother and father, and that there "is also a relapse in behavior after visits," such that it "takes a couple of days to get back on track."

At the November 2017 12-month status review hearing, in accordance with DPSS's recommendation, the juvenile court ordered reunification services for the parents to be continued.

In December 2017, the juvenile court granted DPSS's request that the parents again be allowed to attempt unsupervised visits.

In the February 2018 18-month status report, DPSS reported that unsupervised visitation was going well, stating that "[t]he children have not reported any domestic violence or any problems during the unsupervised visits." DPSS recommended that the children be placed back in the care of mother and father, that the parents receive family maintenance services, and that DPSS be authorized to terminate the dependency upon completion of the case plan.

However, both the caregiver of K.M. and H.M., as well as an investigator for the children's counsel, disagreed with DPSS's assessment. They reported concerns about physical abuse and neglect during the unsupervised visits, including domestic violence and arguing between mother and father, difficulty managing the children, and failure to attend to the educational and medical needs of the children. On one occasion, for

example, during a trip to a store, father "became very angry with [K.M.M.]" and "yelled, grabbed, and shook [her]," then dragged her by the jacket. He then instructed the children not to report what had happened, and to say "everything went fine" if questioned. K.M.M. told a friend that father had hit her on the arms and legs. H.M. returned to the foster home after an overnight visit with bruises and bite marks, but would not say what had happened, stating only that father had told her not to tell the caregiver what happens during visits. After visits with mother and father, the behavior of the three older children deteriorated, including "tantrums, bad language, physical violence towards other children, and self-soiling (enuresis and encopresis)." The caregiver for K.L.M. and H.M. told the investigator that it had been "almost two weeks and she still has not gotten the kids back to normal."

At the contested 18-month review hearing, in April 2018, the juvenile court continued the hearing and ordered psychological evaluations for both parents. The psychologist who conducted both evaluations expressed doubt that either mother or father "would be strong candidates to raise four children, especially children with special needs; therefore, any recommendation of reunification . . . would be with great caution." The psychologist opined that both parents had limited cognitive functioning, and neither "fully grasp[ed] the nature of their own limitations[,] which makes it difficult for them to come to a point of self-confrontation about why the children were removed in the first place."

In a May 2018 addendum to the 18-month status review report, informing the court of the psychological evaluations and updating information regarding the parents' visitation, DPSS recommended that mother and father's reunification services be terminated and that the juvenile court set a section 366.26 hearing.[2] The children's counsel concurred with this recommendation. At the hearing, however, the juvenile court sided with mother and father, ordering the children returned to their custody with family maintenance services. The court expressly forbade the parents from employing corporal punishment. The court set a special interim review hearing for July 2018, and ordered DPSS to visit the home weekly.

In a report submitted in advance of the July 2018 review hearing, DPSS informed the court that a social worker had visited the family home seven times, including three unannounced visits. The social worker found "chaos in the home." The parents seemed "overwhelmed," and were having "difficulty keeping the children and the home clean. Further, they have little control over the children, and the children are getting injured due to a lack of supervision." Nevertheless, the social worker recommended continued family maintenance services, reasoning that the parents were "doing their best," and the children had not reported any domestic violence or corporal punishment.

---

[2] Oddly, the report states that this recommendation is not a change in DPSS's previous recommendation, though it was.

At the interim review hearing, DPSS requested permission to visit the home twice per month, instead of weekly. The juvenile court granted the request, and ordered continued family maintenance services.

On September 26, 2018, the children's counsel filed section 388 petitions, requesting that the children be removed from their parents. The petitions alleged that the children were being abused and neglected by both mother and father. K.M.M. had gone to school with a black eye that she attributed to her father hitting her with a toothbrush. K.M.M. and K.L.M., the two children old enough to interview, both reported being hit by father, and K.M.M. also reported being hit by mother, stating that "Mom hits even harder."

On September 28, 2018, DPSS filed a section 387 petition, also requesting the court to order the children's removal from parent's custody. The petition alleged that mother and father both had failed to comply with their case plan and had failed to benefit from the services provided. The petition further alleged that father "continues to use inappropriate discipline."

In the section 387 detention report, the social worker reported that the parents "lack control of their children, and they appear to lack the sense to know what to do in certain situations, including when to take a child to the doctor." The social worker confirmed that K.M.M.'s black eye was the result of father hitting her with a toothbrush; K.M.M. said that it was on purpose, father stated that it was by accident, during a physical struggle that occurred after he grew frustrated over K.M.M. brushing her teeth

10

too slowly and tried to grab the toothbrush from her. K.L.M. also reported being hit by father, and both K.M.M. and K.L.M. expressed that they were sometimes afraid of their parents. Mother told the social worker that father "hits the children every day." Additionally, on one occasion when S.M. developed a high fever, mother had to be persuaded to take her to the doctor by S.M.'s former foster mother. The children repeatedly injured one another, using physical violence to sort out differences among themselves in the absence of parental supervision. The social worker also observed several unsafe conditions in the home. The parents had failed to block off the home's stairway with a baby gate for S.M.'s safety, even though DPSS had provided a gate. Also an open container of alcohol left in reach of the children. Both maternal and paternal relatives expressed concern about emotional abuse, based on mother's cruel statements to K.M.M.

On September 28, 2018, the juvenile court detained the children based on DPSS's section 387 petition; the section 388 petitions filed on behalf of the children were withdrawn as moot. The children were placed back in their respective former foster homes. The court ordered parents to have supervised visitation twice weekly.

In a section 387 jurisdiction/disposition report, filed in October 2018, DPSS observed that the children appeared happy in their respective foster homes. The caregiver for K.L.M. and H.M. reported that the children had "regressed" while in the parent's custody: K.L.M. "had an episode of enuresis, and that did not occur before. Further, the children take a lot longer to control, however they are redirectable, and they've learned or

11

started to use profanity at their parents' home." She was, however, "able and willing to adopt the children." S.M.'s foster parent informed the social worker that S.M. "has not had adjustment issues or concerns," but had "regressed in terms of speaking." She was able and willing to adopt S.M.[3]

In an addendum report, submitted in November 2018, the social worker observed that the parents' supervised visits with the children "continue to be chaotic." The parents "tried their best," but became "overwhelmed," and "resorted to yelling at the children," as well as at one another.

In January 2019, the juvenile court sustained the allegations of the section 387 petition. It denied mother and father further reunification services, since they had already had two years of services.

The section 366.26 hearing, initially set for May 2019, was continued at the request of DPSS, and DPSS was ordered to make the children available for bonding studies. The bonding studies were conducted in June, and the reports of the psychologist who conducted them were filed with the court in July. The psychologist found, based on a "clinical interview" and observation of two "play session[s]" for each child, that K.L.M., H.M., and S.M. each had a "positive bond" with both mother and father, further characterizing that bond as "strong" with respect to K.L.M. and H.M. The psychologist

---

[3] K.M.M.'s circumstances were more complicated, but need not be described here.

12

opined that each of the three children likely would "suffer detriment if the parent/child relationship is terminated" as to both mother and father.

DPSS recommended that mother's and father's parental rights as to K.L.M., H.M., and S.M. be terminated, with the plan of being adopted by their current caregivers. K.L.M. and H.M. were placed together, with the same caregiver since September 2018; K.L.M. had also lived with that caregiver from November 2016 to May 2018, and H.M. had been with her from June 2017 to May 2018. S.M. had been placed with her prospective adoptive parent from September 2016 to May 2018, and again since September 2018. The three children each had certain special needs, but generally were thriving in the homes of the prospective adoptive parents, who were well equipped to meet those special needs.

The parents continued to visit with the children. The social worker described the visits as "marginal," sometimes marred by "failed redirections" and "the children acting out of control," though there were also times when the visits were "appropriate." The prospective adoptive mother of K.L.M. and H.M. reported that, although the children's behavior was generally improved, it often regressed for a few days following visitation with mother and father.

The continued section 366.26 hearing for K.L.M., H.M., and S.M. was begun on December 5, 2019, but not completed until January 30, 2020. The psychologist who performed the bonding studies testified, as did the prospective adoptive mother of K.L.M.

and H.M. Rather than call K.M.M., K.L.M., and H.M. to testify, the parties stipulated to what the three would say, if they were to testify.[4]

During his testimony, the psychologist estimated that there was over a 70 percent chance that K.L.M. and H.M. would suffer detriment if their parental relationships were severed, and a 51 percent chance S.M. would suffer detriment. He conceded, however, that his evaluation did not take into account various factors that might have changed his conclusions. He allowed, for example, that he would "question the bond" if the child was consistently defiant or threw tantrums, and the parent was unable to redirect them. He also would "question the bond" if the parent regularly became frustrated with the child's behavior and resorted to yelling or making inappropriate statements in anger or frustration. He would "definitely question the bond" if a parent yelled, grabbed, and shook a child's older sister, then dragged her by the jacket when they went to a local store, and then instructed both the child and the older sister not to tell their foster mothers about what had happened. His assessment also did not take into account information about the children's behaviors and development improving while in foster care, and regressing while in the parents' custody or after visitation with the parents.

The prospective adoptive mother of K.L.M. and H.M. testified regarding, among other things, her observations of the relationship among the four siblings. She described sibling visits as "chaotic," with the children tending to do "[j]ust the typical things that

_____

[4] S.M. was "too young to understand the concept of adoption." No stipulated testimony was offered on her behalf.

14

the kids do, the tantrums, the falling-out, the wandering off, the bad language, not listening, just total defiance." She testified that K.M.M. has expressed that she "has no interest in speaking to her sisters," either in visits that the prospective adoptive mother has tried to arrange or by phone. After sibling visits, she reported, K.L.M. and H.M. "come home and complain that [K.M.M.] doesn't want to play with them at the visit, that she was mean to them, that she doesn't want to talk to them." The prospective adoptive mother suggested K.M.M.'s attitude may be attributable to father's influence, reporting that K.M.M. had told her that father would be upset if she participated in a sibling visit: "[he] basically said that foster parents were the devil. The social worker was the devil, just a lot of comments to that nature." Both K.L.M. and H.M. have expressed they wanted to maintain a relationship with S.M., and the three girls are regularly in contact via phone and video calls. The prospective adoptive mother testified that she had a "working relationship" with S.M.'s prospective adoptive parent, and was open to allowing continued visitation between the siblings.[5]

The parties stipulated that K.M.M. would testify: "I do not want my siblings to be adopted. I want us to be a family again. I will be sad if I never saw my siblings again." The stipulated testimony of K.L.M. was; "I want to live with [the prospective adoptive mother]. My mom and dad say bad words to each other, and [mother] was crying. I like

---

[5] S.M's prospective adoptive parents have expressed that they "would not feel comfortable" with future sibling visits "if the siblings are placed with birth relatives." K.L.M. and H.M.'s prospective adoptive mother, however, is not a birth relative of the children.

15

[the prospective adoptive mother] a hundred percent. I want to visit my mom and dad." The stipulated testimony of H.M. was: "I want to live with [mother]. If I live with [the prospective adoptive mother], I want to visit my mom and dad."

The juvenile court found by clear and convincing evidence that K.L.M., H.M., and S.M. were likely to be adopted, found that neither the beneficial parental relationship nor the sibling relationship exceptions applied, and ordered mother's and father's parental rights to the three children terminated.

## II. DISCUSSION

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for a dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53.) "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption [the choice the court made here]; (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*Id.* at p. 53.) "Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'" (*Ibid.*)

To avoid termination of parental rights, a parent must prove one or more statutory exceptions apply. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*).) Two such exceptions are at issue here: the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)), and the sibling relationship exception (§ 366.26,

16

subd. (c)(1)(B)(v)).  For the reasons below, we reject the parents' arguments that the juvenile court erred by failing to apply one of these exceptions.

A.  *Beneficial Parental Relationship Exception*

The beneficial parental relationship exception applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The parent has the burden of proving his or her relationship with the child would outweigh the wellbeing gained in a permanent home with an adoptive parent.  (*Anthony B.*, *supra*, 239 Cal.App.4th at pp. 396-397.)

In determining the applicability of the beneficial parental relationship exception, the court considers "'"[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."'"  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  "A showing the child derives some benefit from the relationship is not sufficient ground to depart from the statutory preference for adoption."  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.)  Furthermore, evidence of frequent and loving contact is not enough to establish a beneficial parental relationship.  (*Ibid.*)  The parent must also show he or she occupies a parental role in the child's life.  (*Ibid.*)  "The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact

17

is not necessarily required, although it is typical in a parent-child relationship.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

Our review of the juvenile court's ruling incorporates both the substantial evidence and abuse of discretion standards.[6] We generally review the juvenile court's finding as to the existence of a beneficial parental relationship for substantial evidence. (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.) But where the juvenile court found the parent failed to carry his or her burden of proof, the question is more properly stated not in terms of substantial evidence, but rather "whether the [appellant parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) We apply the abuse of discretion standard to the juvenile court's determination of whether termination of the parental relationship would be detrimental to the child as weighed against the benefits of adoption. (*Anthony B.*, at p. 395.) We will not reverse the juvenile court's order as an abuse of discretion unless the court made an arbitrary, capricious, or patently absurd determination. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

---

[6] Our Supreme Court has taken up the issue of whether this hybrid standard of review is correct in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839. Our conclusions would be the same under any of the potentially applicable standards, all of which are deferential to the conclusions of the juvenile court.

18

The juvenile court's conclusion—that mother and father had failed to prove the benefits of their relationships with the children outweigh the well-being the children would gain in a permanent home with an adoptive parent—was well within the bounds of reason. Though bonding studies concluded the children would suffer detriment from severing the parental bonds with mother and father, the juvenile court reasonably found the reports to be "extremely cookie-cutter," and the psychologist's opinions not to be "well-substantiated in terms of the underpinnings of his positions or his articulations for his positions." Furthermore, the psychologist repeatedly retreated from his own conclusions when confronted with additional facts, not revealed by his brief investigation of the family.

Moreover, even after two years of services, mother and father continued to demonstrate an inability to parent the children adequately. Supervised visits were chaotic, but unsupervised visitations were worse, devolving into neglect, as well as physical and emotional violence, as the parents became overwhelmed. The children, each of whom has special needs of one sort or another, thrived when removed from parents' custody, and tended to regress when in placed back into their care, or even just after visitation. (See *In re E.T.* (2018) 31 Cal.App.5th 68, 77 ["The standard is whether the children benefit from [a parent's] presence in their lives"].) There is no dispute that mother and father consistently visited with the children, and we may assume for present purposes that they share a parental bond with them. Nevertheless, it was neither

19

arbitrary, capricious, or patently absurd for the trial court to find any arguable detriment to the children from the severing of their parental relationships was outweighed by the benefits of adoption.

The parents argue that the trial court erred by failing to select legal guardianship as the children's permanent plans. We disagree. "The Legislature has decreed . . . that guardianship is not in the best interests of children who cannot be returned to their parents." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.) Here, there is little if any evidence that the children ever could be returned to the custody of mother and father. And, as noted, visitation with the parents repeatedly proved to be detrimental to the children, not beneficial. This is simply not a case where there is "no evidence that the security and stability of the child's placement would be jeopardized by the retention of parental rights" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1208.)

The trial court correctly concluded that the beneficial parental relationship exception does not apply here.

B. *Sibling Relationship Exception*

The sibling relationship exception applies only when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the

20

child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 61.) "The ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*Id.* at p. 55.)

In reviewing a challenge to a juvenile court's decision to apply or not apply the sibling relationship exception, we employ two possible standards of review, depending on the nature of the challenge. (*In re J.S.* (2017) 10 Cal.App.5th 1071, 1080.) We generally apply the substantial evidence standard in evaluating the court's factual findings, such as whether the child has a close and strong bond with a sibling. (*Ibid.*) Again, however, where the juvenile court found a parent failed to carry his or her burden of proof, the question is more properly stated not in terms of substantial evidence, but rather "whether the [appellant parent's] evidence was (1) 'uncontradicted and

21

unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) We apply the abuse of discretion standard in evaluating the court's discretionary determinations, such as whether there is a compelling reason for concluding that terminating parental rights would be detrimental to the child. (*In re J.S.*, at p. 1080.)

Father contends that the juvenile court failed to "adequately weigh the benefit of continuing [S.M.'s] relationships with her older sisters against the benefit of her being adopted by her foster caretakers." (Capitalization and bolding altered.) There is no evidence, however, that the children, "other than being sad, would suffer detriment if the [sibling] relationship ended." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.) Moreover, the prospective adoptive parents of S.M., K.L.M., and H.M. have been working together to keep those three children in contact. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 254 [willingness of prospective adoptive family to facilitate sibling visits is a factor demonstrating there will not be substantial interference with the sibling relationship].) K.M.M., too, has been invited to participate, but has declined, whether of her own accord, or because of father's negative influence. Either way, however, father can point to nothing in the record compelling the conclusion that *adoption* would interfere with the relationships among any of the four siblings, let alone that the detriment from such interference would outweigh the benefits of adoption.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

MILLER
Acting P. J.

SLOUGH
J.